IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JENNIFER R. SCOTT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. _____ |
| | § | |
| MIMEDX GROUP, INC. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, the Plaintiff, Jennifer R. Scott, and files her Original Complaint complaining of Defendant, MiMedx Group, Inc., and for cause of action would respectfully show the Court as follows:

### I.

### JURISDICTION

1. It appears that the Court has jurisdiction under 28 U.S.C. § 1331 because there is a federal question, and 42 U.S.C. § 1988(a).

### II.

### VENUE

2. Venue is proper in the Northern District of Texas because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred there.

### III.

### PARTIES

3. Plaintiff Jennifer R. Scott is an individual who is a citizen of the State of Texas.

4. Defendant MiMedx is a Florida Corporation with its principal place of business in Marietta, Georgia and may be served by serving its registered agent MiMedx Group, Inc., 1775 W. Oak Commons Ct., Marietta, Georgia 30063.

## IV.

## OVERVIEW

5. Defendant terminated Plaintiff, in part, because she reported Defendant practice of tissue tagging, which adversely effects the accurate reporting of revenue by Defendant. Plaintiff's sex (female) was also a motivating factor in her termination by Defendant.

## V.

## FACTS

6. Defendant is in the business of producing and selling amniotic tissue and fluid. Stock for Defendant is publicly traded on the Nasdaq stock exchange.

7. Plaintiff was a loyal Regional Sales Director of Defendant who was continuously praised for her performance.

8. Defendant has a process in place to deal with tissue tagging discrepancies among the different divisions. Tissue tagging at Defendant is a system that is set up to track revenue by division, commissions and patient implant information.  Tissue tagging requires the representative, Regional Sales Director or Customer service representative to input information into Salesforce.

9. A Tissue Tagging Review Form, or TTRF, is produced by a sales representative or Sales Director, outlining the complaint with factual information, and ultimately sent to the Tissue Tagging Review Board for a final decision.

10. The Tissue Tagging Review Board consists of Defendant executives, including Kevin Lilly.

11.     On numerous occasions, Plaintiff reported to Tim O'Brien – VP, Joe Longo – VP, and Mike Carlton – Senior VP of Sales, and to the Tissue Tagging Committee that tissues were being mistagged beginning in the Spring and Summer of 2016.

12.     This mistagging of tissue distorted the nature and extent revenue that was reported by Defendant.

13.     Tim O'Brien also scheduled conference calls with himself, Joe Longo, his superior, and Plaintiff to discuss this and other issues with the Wound Care Division.  On several occasions Plaintiff brought up the fact that revenue was being misreported due to tissue tagging discrepancies to both Tim O'Brien and Joe Longo.  These types of conversations happened at least a dozen times.  It was a regular topic on Surgical (SSO) conference calls as well amongst all the SSO Regional Directors, Tim O'Brien and Joe Longo.

14.     It was so commonplace as a topic, that the SSO Sales Directors would joke about Wound Care Division getting the credit or revenue that it should not have openly on conference calls.

15.     The executives, including Chris Cashman- Executive Vice President and Chief Commercialization Officer, were well -aware of the tissue tagging problem. Mike Carlton sent out email communications regarding tissue tagging and consequences for mistagging.  Tim O'Brien even had a conference call with Chris Cashman to discuss the tissue ,odtagging issue.  Tim O'Brien advised Plaintiff that he felt like Cashman had actually listened and understood.  Then nothing changed.

16.     Defendant was purposely turning a blind eye to the misreporting of revenue.  Plaintiff discussed this with other Regional Sales Directors and they thought the same thing as well.  In these conversations with other Regional Sales Directors, they discussed  the gravity of misreporting revenue and how that was illegal.  Plaintiff and others had reported it up our chain of

command over and over, with nothing ever changing. It became obvious to the Regional Sales Directors that the misreporting of revenue benefitted the company by inflating Wound Care revenue numbers.

17. Since Wound Care is a multi-billion dollar market, and most importantly, Wound Care directly is reimbursed by insurance and Medicare and provides a financial incentive to healthcare providers to use the products, unlike products billed in relation to surgery (OR). This is particularly important to show "the Street" and potential investors that Defendant has strong Wound Care Division revenue.

18. The Wound Care revenue reported by Defendant is misleading as a result of the mistagging practices of Defendant. Because Surgical procedures were mistagged by individuals in the Wound Care division as "wound " instead of "orthopedics – knee" for example, the revenue was reflected as "Wound" as opposed to "Surgical", when it was clearly a surgical procedure done in the operating room, not in an outpatient Wound Care clinic.

19. Defendant reports their revenue by division, either "Wound Care" or "Surgical/SSO". This is openly reflected in Defendant's press releases.

20. Defendant's misreporting the amount of Wound Care revenue has misled investors to think Defendant's Wound Care Division was growing at a much larger rate than it actually was, thus, making Defendant a more attractive potential investment.

21. The circumstances and timing surrounding the end of Plaintiff's employment was suspicious.

22. Plaintiff had especially great performance measures in the fourth quarter wrapping up a great year during which Plaintiff received accolades.

23. Executives and upper management of Defendant became upset with Plaintiff's reports of mistagging.

24. In December 2016, Plaintiff's tissue tagging reports were considered by the Defendant Tissue Tagging Review Board, which included Kevin Lilly.

25. By email dated December 31, 2016, CEO Parker "Pete" Petit indicated that the company's reorganization had been completed.

26. Around January 18, 2017, Defendant informed Plaintiff her position was being eliminated as part of a reorganization.

27. Senior VP Kevin Lilly said he had everything to do with Plaintiff being fired.

28. Near the time of Plaintiff's termination, Kevin Lilly made sexist and derogatory comments about Plaintiff and other women. Mr. Lilly stated that Plaintiff "could f__k up a wet dream." Mr. Lilly also made derogatory comments about other female employees, such as one female employee only had a job because she had breasts. Mr. Lilly also said "for me [Plaintiff] is the most hated woman."

29. Plaintiff's responsibilities were given to another employee while Defendant advertised for a position that took over my responsibilities.

30. Other less successful male co-workers and/or co-worker's who had not reported mistagging kept their positions and were treated more favorably.

31. Eventually, a male was selected by Defendant to effectively replace Plaintiff.

32. In June 2018, Defendant through its audit committee determined it lacked internal controls regarding revenue reporting and that the committee would review its compliance with the Sarbanes-Oxley law.

## VI.

## OSHA

33. Plaintiff filed a complaint with OSHA on or about May 26, 2017.

## VII.

34. Plaintiff filed an EEOC charge of discrimination on or about October 3, 2017. Plaintiff received a right to sue letter dated June 21, 2018.

## VIII.

## CAUSES OF ACTION

35. Defendant's termination of Plaintiff violated 18 U.S.C. § 1514A et. seq. (Sarbanes Oxley).

36. Defendant's termination of Plaintiff because of her sex violated 42 U.S.C. § 2000-e2. (Title VII).

## IX.

## DAMAGES

37. As a result of Defendant's actions, Plaintiff has suffered in the past, and in all reasonable likelihood, will suffer in the future, damages including, lost wages, lost earning capacity, mental anguish, emotional pain and suffering, lost employment benefits, inconvenience, loss of enjoyment of life, damage to professional reputation, liquidated damages, and other damages.

38. Plaintiff seeks punitive damages.

39. Plaintiff also seeks reinstatement to a comparable position if feasible.

40. Plaintiff seeks attorney fees.

41. Plaintiff seeks costs of court and expert fees.

## X.

## JURY DEMAND

42. Plaintiff demands a jury trial.

## XI.

## PRAYER

43. WHEREFORE, Plaintiff prays that the Defendants be duly cited to appear and answer herein, that upon a final trial of this cause, Plaintiff recover:

1. Judgment against Defendants, for Plaintiff's damages and attorney fees as set forth above;

2. Reinstatement to a comparable position;

3. Interest on said judgment at the legal rate from date of judgment;

4. Prejudgment interest as allowed by law;

5. Costs of Court; and

6. Such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

/s/ JASON C.N. SMITH
JASON C.N. SMITH
State Bar No.  00784999

LAW OFFICES OF JASON SMITH
600 Eighth Avenue
Fort Worth, Texas 76104
Telecopier: (817) 334-0880
Telephone: (817) 334-0898
E-mail: jasons@letsgotocourt.com
ATTORNEYS FOR PLAINTIFF