IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JENNIFER R. SCOTT, | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:18-CV-01815-S |
| MIMEDX GROUP, INC. | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S APPENDIX IN SUPPORT OF PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER AND MOTION TO SUPPRESS AUDIO RECORDINGS

**APPENDIX**

Excerpts of Amy Powers Deposition ……..…..…………………………..……….     1-29

Excerpts of Kevin Lilly Deposition ………..…..……………………….…………     30-48

Amy Powers Note on Ritz Carlton Stationary …….…..…………………..……..     49

Amy Powers Audio Recording of Kevin Lilly and Others on January 30, 2017
at the Ritz Carlton Hotel ……….…………………..……….……………………     50

Respectfully submitted,

/s/ JASON C.N. SMITH
JASON C.N. SMITH
State Bar No. 00784999

LAW OFFICES OF JASON SMITH
600 Eighth Avenue
Fort Worth, Texas 76104
(817) 334-0880, telephone
(817) 334-0898, facsimile
Email: jasons@letsgotocourt.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2019, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court and in accordance with the Federal Rules of Civil Procedure. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means: Harold D. Jones.

/s/ JASON C.N. SMITH
JASON C. N. SMITH

1                  IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION
3
4        JENNIFER R. SCOTT,                  )
                                             )
5                      Plaintiff,            )
                                             )
6        vs.                                 ) NO. 3:18-CV-01815-S
                                             )
7        MIMEDX GROUP, INC.                  )
                                             )
8                      Defendants.           )
         _____)
9
10
11
12
13                 VIDEOTAPED DEPOSITION OF AMY POWERS
14
15                       Scottsdale, Arizona
                         August 13, 2019
16                          9:12 a.m.
17
18
19
20
21        Prepared by:
          SUSAN D. BINGHAM, CR, RPR
22        Certificate No. 50364
23
          Prepared for:
24        DISTRICT COURT
25        (Original)

                                                       Page 1

1  videographer.  The court reporter is Susan Bingham

2  from the firm Veritext.  I am not authorized to

3  administer an oath, I am not related to any party

4  in this action nor am I financially interested in

5  the outcome.

6        Counsel and all present in the room and

7  everyone attending remotely will now state their

8  appearances and affiliations for the record.  If

9  there any objections to proceeding, please state

10  them at the time of your appearance, beginning

11  with the noticing attorney.

12        MR. SMITH:  Jason Smith for the plaintiff,

13  Jennifer Robyn Scott.

14        MR. JONES:  Harry Jones with Littler

15  Mendelson for the defendant MiMedx.

16        THE VIDEOGRAPHER:  Will the court reporter

17  please swear in the witness.

18              *   *   *

19              AMY POWERS,

20  called as a witness herein, having been first duly

21  sworn, was examined and testified as follows:

22        THE VIDEOGRAPHER:  Thank you.  You may

23  proceed.

24

25              *   *   *

Page 6

```
 1                         EXAMINATION
 2      BY MR. SMITH:
 3           Q.  Could state your name for the court and
 4      jury, please.
 5           A.  Amy Powers.
 6           Q.  And we're taking your deposition today in
 7      Scottsdale, Arizona?
 8           A.  Correct.
 9           Q.  And you have given an oath to tell the
10      truth as if you were sitting in front of a judge
11      and a jury; correct?
12           A.  Yes.
13           Q.  And you understand that your testimony may
14      be used later at trial if this case goes to trial
15      in Dallas, Texas?
16           A.  Yes.
17           Q.  All right.  At one point did you work for
18      the defendant MiMedx?
19           A.  Yes.
20           Q.  And what was your position with MiMedx?
21           A.  I started as an area federal director in
22      the -- in a federal division that was newly
23      created in September of 2014.
24           Q.  Okay.  We'll get into some specifics in a
25      minute, but did you overhear a conversation in
```

Page 7

1    going to mark those documents as a group as

2    Exhibit 3.

3         A.   Okay.

4         (Deposition Exhibit No. 3 was marked for

5    identification.)

6         Q.   BY MR. SMITH:   And those include some

7    emails that you sent at MiMedx; correct?

8         A.   Correct.

9         Q.   They also include a blue document, and can

10   you tell us what that blue document is, if you

11   could hold it up for the video?

12        A.   Yes.   So this was -- it was a notice in

13   the room from the Ritz-Carlton which is the hotel

14   where MiMedx held the actual sales meeting and --

15        Q.   That's the hotel in Florida?

16        A.   Yeah, correct, hotel -- the Ritz-Carlton

17   in Florida.   And at the time that Kevin Lilly was

18   having this conversation with the people in the

19   room he was with, the one thing that -- you know,

20   I was recording it at the time, but the one thing

21   that really stuck out to me is he said -- and I

22   took a hand note on it, he said, The one person

23   who could fuck up a wet dream, and he was

24   referring -- this was actually about a regional

25   sales director who had just lost her job with the

Page 14

1       company and her name is Robyn Scott.  So I had

2       just taken a handwritten note at the time that

3       that was actually happening because it just, you

4       know, appeared to me to be something that was

5       pretty -- a detrimental thing to say about

6       somebody in a room full of colleagues.

7            Q.  And you wrote it on this piece of paper

8       that was in the hotel room?

9            A.  Yes, I did.

10           Q.  Was this just a random piece of paper that

11      was nearby?

12           A.  Yes, it was.

13           Q.  And you kept -- you kept that piece of

14      paper?

15           A.  Yes, I -- I produced this document as part

16      of my complaint that I gave to MiMedx human

17      resources.  So it was part of what I presented.

18           Q.  And is this the original document?

19           A.  Yes, this is.

20           Q.  Okay.  And then you also, as a part of

21      Exhibit 3, there's some more emails with MiMedx

22      concerning a complaint you filed regarding the --

23      what I'll call the Kevin Lilly situation?

24           A.  Yes.

25           Q.  If I refer to the Kevin Lilly situation

                                              Page 15

1    can we have an understanding that that is the

2    situation in which you and Susan Schardt overheard

3    Kevin Lilly and others at a MiMedx off-site

4    meeting in Florida?

5         A.   Yes.

6         Q.   And do you believe that Exhibit 3 reflects

7    all the documents that are responsive to Request

8    No. 2?

9         A.   Yes.

10        Q.   Okay.  So you've brought today -- well,

11   you've provided in response to the subpoena

12   Exhibit 2, which is a recording, and Exhibit 3,

13   which are emails you've had with MiMedx regarding

14   the Kevin Lilly situation, and the blue

15   Ritz-Carlton document in which you wrote a note

16   while you were hearing the conversation?

17        A.   Yes.

18        Q.   All right.

19        Q.   What type of business is MiMedx?

20        A.   It is a medical device manufacturer and

21   marketer for allograft and -- allograft tissue,

22   basically, used in wound care and used in various

23   other practices, orthopedics and pain management

24   and...

25        Q.   What is allograft?

Page 16

1      reported to?

2              A.   Pete Petit.

3              Q.   Okay.

4              (Deposition Exhibit No. 5 was marked for

5      identification.)

6              Q.   BY MR. SMITH:   Now, let me show you what's

7      marked as Exhibit 5 to your deposition.

8              On January 17th, 2017, Chris Cashman

9      issued Exhibit 5, which is -- the subject is

10     Organizational Announcement?

11             A.   Yes.

12             Q.   Do you recall seeing this?

13             A.   I do recall it.

14             Q.   And did you learn as a result of the

15     organizational announcement that MiMedx ended the

16     employment of Robyn Scott?

17             A.   I didn't know at the time this was put

18     out.   It wasn't -- there weren't any names.

19             Q.   Okay.   Did you find out around January

20     17th, 2017 that Robyn Scott was terminated from

21     MiMedx?

22             A.   Yes.

23             Q.   Okay.   And how did you find that out?

24             A.   Talked to Robyn Scott.

25             Q.   Okay.   And then did you also find out from

                                                    Page 27

1       been the regional sales director for the north

2       part of Texas?

3            A.  Yes.

4            Q.  And the western part of Texas?

5            A.  Yes.

6            Q.  All right.  And then you -- then you also

7       talked to Robyn Scott around that time?

8            A.  I believe so.

9            Q.  And what did she tell you about the

10      termination?

11           A.  I don't remember.

12           Q.  Was she surprised?

13           A.  Yes, very.

14           Q.  Were you surprised?

15           A.  Yes.

16           Q.  Why?

17           A.  Because she was a performer.  I believe at

18      the time I would have to say she was number two in

19      our division of -- I think there were six of us in

20      our division, six regional sales directors, so I

21      was surprised to hear that she had been let go

22      because her performance was actually higher than

23      mine.  So my typical reaction was to think, I

24      could be next if they're letting go somebody who's

25      performing, then...

                                              Page 29

1       that occurred at the national team meeting, which

2       was me and my colleague Susan Schardt overhearing

3       Kevin Lilly discussing such things as why Robyn

4       Scott was fired from -- or no longer with

5       MiMedx.

6              Q.   Okay.  And this --

7              A.   My complaint -- I guess a complaint.

8              Q.   Okay.  Would you say Exhibit 6 is the

9       complaint you filed --

10             A.   Yes, it is.

11             Q.   -- regarding the Kevin Lilly incident?

12             A.   Yes, it is.

13             Q.   And it indicates that the location was at

14      the MiMedx national team meeting, Orlando,

15      Florida, Ritz-Carlton?

16             A.   Yes.

17             Q.   So this occurred in Orlando?

18             A.   Yes.

19             Q.   And do you recall the dates of the MiMedx

20      national team meeting?

21             A.   I don't recall -- I know around the

22      time -- I know because of this incident.  I can't

23      remember if we were there the 27th, January 27th

24      of 2017.

25             Q.   Okay.

Page 31

1          A.   To approximately February 2nd, I

2    believe --

3          Q.   Okay.

4          A.   -- 2017.

5          Q.   And the Kevin Lilly incident occurred on

6    January 30th, 2017?

7          A.   Yes.

8          Q.   Okay.   And what caused you to create

9    Exhibit 6?

10          A.   So at the time of -- on January 30th of

11    2017 I was in a room with a colleague, a hotel

12    room -- her hotel room to be exact -- and we heard

13    a loud group of guys coming back from wherever

14    next to us, and they -- it turned out to be the

15    leader -- a lot of the leadership team of MiMedx.

16    And they were immediately just really talking very

17    sexist things about women.

18          Q.   Okay.

19          A.   And so I made a recording of that and --

20    not to do anything with it, however people found

21    out about it and my superior -- Tim O'Brien and

22    Joe Longo came to me after this meeting and asked

23    me if that had happened, and I said yes, and they

24    told me I needed to file a complaint.

25               So that's when I formulated this email to

                                        Page 32

1    go over, you know, exactly kind of step by step

2    what had happened that evening.

3        Q.   Okay.   So is Exhibit 6 a complaint that

4    Tim O'Brien and Joe Longo asked you to put in

5    writing?

6        A.   Actually at the time I put it in writing I

7    was asked to put it in writing by Thornton Kuntz

8    because at this time it had been escalated to

9    human resources.

10        Q.   Okay.   And did you understand that the

11    MiMedx -- did MiMedx have a sex discrimination and

12    sexual harassment policy?

13        A.   Yes.

14        Q.   And did -- was it your understanding that

15    the MiMedx policy provided that employees could

16    file complaints about sex discrimination and

17    sexual harassment?

18        A.   I don't know the laws behind that.

19        Q.   Okay.

20        A.   I just know that it was wrong and it

21    was -- I knew it was something that...

22        Q.   Okay.   And Thornton Kuntz asked you to put

23    it in writing?

24        A.   Yes, he did.

25        Q.   Okay.   So the MiMedx national team meeting

Page 33

```
 1         was from approximately January 27th to February
 2         2nd in Orlando, Florida?
 3              A.   Correct.
 4              Q.   And it took place at the Ritz-Carlton?
 5              A.   Yes.
 6              Q.   And, generally, what type of activities
 7         were occurring at the national team meeting?
 8              A.   Typically it was -- it's a very, very long
 9         day of meetings, so starting at 7:30 -- as early
10         as 7:00, 6:30 in the morning and going until about
11         6:00 at night, different break-out sessions.  We
12         would have sessions together as an entire company,
13         so these were sales strategy meetings.  And then
14         we would break out into our various regions to
15         address our -- our business.  So we would talk
16         sales numbers, trends, strategies.
17                   And then our evenings typically either
18         were filled with dinners or activities.  And then
19         on the day that the incident occurred with Kevin
20         Lilly we were actually given a half day of free
21         activities.  So you could choose from golf, spa
22         day or just free day or I believe they had a
23         catamaran cruise or something like that set up.
24              Q.   In your previous testimony I think you
25         mentioned Susan Schardt.  Was Susan Schardt
```

Page 34

1      employed by MiMedx?

2           A.   Yes.

3           Q.   And what was her position?

4           A.   She was an account executive in the wound

5      care division.

6           Q.   Okay.  And did you all, on your -- the --

7      on the January 30th, 2017 when you all were given

8      a free day, did you all have an activity

9      together?

10          A.   We -- yes, we had a spa -- both had -- not

11     at the same time but both had spa treatments at

12     the Ritz-Carlton.

13          Q.   Okay.  And after that, did you go back to

14     her room?

15          A.   Yes.

16          Q.   And what were you all going to do?

17          A.   Just hang out and catch up.  We were close

18     friends.

19          Q.   Okay.  And did her room have a balcony?

20          A.   Yes.

21          Q.   And were you in the room at approximately

22     4:30 p.m., according to Exhibit 6?

23          A.   Yes.

24          Q.   And I think you had 4:30 p.m. Eastern

25     Standard Time?

Page 35

1        A.   Yes.

2        Q.   That would be Florida time?

3        A.   Correct.

4        Q.   Okay.  And did you hear some people

5    talking loudly?

6        A.   Yes.

7        Q.   By the way, does Exhibit 6, was that

8    written closer to the time of the incident?

9        A.   Exhibit 6 -- yeah, 6 was written around

10    February 8th, so pretty close.

11        Q.   Okay.  And does it refresh your

12    recollection about the events of January 30th of

13    2017?

14        A.   Yes.

15        Q.   Okay.  And what did you hear?

16        A.   Conversations.  I couldn't hear all of

17    them, just -- Kevin Lilly was pretty loud and,

18    like I said, initially when they came into the

19    room he was talking about hiring prostitutes and

20    how they all had girls at these meetings.  It was

21    very inappropriate for a leadership team to be

22    discussing.

23        Q.   And I want to break down what you heard.

24    So you -- you heard some voices coming -- male

25    voices coming from the next room?

Page 36

1          A.   Yes.

2          Q.   And was one of those -- were they loud?

3          A.   Yes.  Loud enough that it, even with the

4     door closed, the balcony door, you could still

5     hear them.  It was loud.  And I don't know --

6     could not see them.

7          Q.   Could you tell if they were on the

8     balcony?

9          A.   No, could not tell.

10         Q.   Okay.  Could you -- did you recognize the

11    voice of Kevin Lilly?

12         A.   Yes, I did.

13         Q.   Had you heard Kevin Lilly talk before?

14         A.   Yes.

15         Q.   Had he made presentations at the MiMedx

16    national team meeting that week?

17         A.   Yes.

18         Q.   Had you met him before that national team

19    meeting?

20         A.   Yes.

21         Q.   And what -- what do you recall the first

22    things that you initially heard -- well, let me

23    back up.  Scratch that.

24              What other voices did you hear from the

25    next room next to Susan Schardt's room?

Page 37

1         A.  Area vice president Ricky Palmer; Lane

2    Clark, the regional sales director; Frank Braly,

3    who was a regional sales director; Kevin Lilly.

4         Q.  Okay.  Did you hear Joe Panther?

5         A.  Yes, Joe Panther.  And then this -- from

6    reading this, Adam, who was somebody I didn't

7    know.

8         Q.  Okay.  And what was the -- did Kevin Lilly

9    say things in that conversation that concerned

10   you?

11        A.  Yeah, he did initially, just hearing him

12   come in and he was talking about how they hire

13   prostitutes at sales meetings, how they all have

14   girls at these meetings, how he has a big suite so

15   if any of the guys needed to use it, they could

16   use it, meaning if they were bringing girls back,

17   I guess.  So immediately it was very

18   inappropriate.

19        Q.  Okay.  And did you, as a result of hearing

20   these comments, did you or Susan Schardt do

21   anything to record the conversation?

22        A.  Yes.  I recorded it on my iPhone.

23        Q.  Okay.  And did Ms. Schardt record the

24   conversation as well on her phone?

25        A.  Yes.

Page 38

1        Q.   And how did you go about recording it?

2        A.   On Voice Memo, which is a utility under

3    the iPhone.  So you just record -- press record.

4    And it was actually -- I had the phone sitting

5    halfway in the room and halfway in the balcony.

6        Q.   Okay.  Did you hear Kevin Lilly make any

7    comments about specific female employees of

8    MiMedx?

9        A.   Yes.  Specifically, from what I -- the

10   biggest one that I recall is his comments he made

11   about Robyn Scott.  And he actually brought it up

12   as saying, he said, Ding dong, the witch is dead,

13   referring to Robyn Scott and meaning that she was

14   no longer with the company.  And he said, I had

15   everything to do with that, her not being with the

16   company anymore.  And then he went on to say,

17   She's the kind of woman that could fuck up a wet

18   dream.

19       Q.   From those comments did you think that

20   Kevin Lilly was responsible for Robyn Scott no

21   longer being with the company?

22       A.   Yes, he said that.

23       Q.   And from those comments did you think that

24   Robyn Scott being a female was a factor in Kevin

25   Lilly not wanting her to be with the company?

                                              Page 39

1    A. Yes.

2    Q. What was your reaction when you heard

3  those comments?

4    A. I actually broke down crying at the time

5  because I thought it was awful that he would say

6  that about another human being and, you know,

7  that's somebody's career.  So it was actually

8  pretty emotional for me.

9    Q. In the interactions you saw Robyn Scott

10  engage in in the company, did she -- was she

11  professional?

12    A. Very professional.

13    Q. Did you think it was appropriate to

14  describe her as a witch?

15    A. Nope.

16    Q. Did you write anything down when you were

17  listening to the conversation?

18    A. I did.  I wrote down on a blue sheet of

19  paper, which I have here --

20    Q. And that's part of Exhibit 2?

21    A. Correct.

22    Q. And what did you write down on the blue

23  sheet of paper?

24    A. I wrote down, "One person who could fuck

25  up a wet dream, RSD, Robyn Scott."

Page 40

1    Q.   Can you hold that up for the video.

2    A.   Yes.

3         (Witness complying.)

4    Q.   And is that your handwriting on the blue

5    piece of paper that is a part of Exhibit 2?

6    A.   Yes.

7    Q.   And can you read specifically what you

8    wrote down.

9    A.   Yes.  "One person who could fuck up a wet

10   dream, RSD, Robyn Scott."

11   Q.   Did you hear Kevin Lilly make any comments

12   about any other female employees with the

13   company?

14   A.   He -- I believe he made a comment about a

15   sales -- or an account executive, sales rep,

16   Catherine -- and I can't remember her last name

17   right now.

18   Q.   Is it Catherine Sullivan?

19   A.   Catherine Sullivan, correct.  And I'm

20   just -- I'm reading that from my summary of the

21   incident.

22   Q.   Did Kevin Lilly make comments about

23   Catherine Sullivan and how she gets business?

24   A.   Yes.

25   Q.   And do you recall specifically what he

Page 41

1    said about Catherine Sullivan?

2         A.   I don't recall exactly.

3         Q.   Okay.  Do you have a general recollection

4    about the types of comments?

5         A.   Yes, that she used her femininity, and I

6    believe he actually said her tits to get

7    business.

8         Q.   Okay.  Did you regard that as a sexist

9    comment?

10        A.   Yes.

11        Q.   Then actually after your note about

12   Catherine Sullivan in Exhibit 6, did he also make

13   a comment -- I think you wrote down, "I would like

14   to go on record about number two."

15             Do you know what that was referring to?

16        A.   That was referring to the comment that

17   Kevin Lilly made about Robyn Scott about a person

18   that could fuck up a wet dream.

19        Q.   Okay.  All right.

20        A.   So to me that was him -- I mean, obviously

21   talking about his erection, and I just thought

22   that was very sexually inappropriate.

23        Q.   Okay.  And we may listen to a part of the

24   recording in a bit, but did the -- did the

25   recording you had of Kevin Lilly's conversation

                                        Page 42

1      national team meeting that you overheard on

2      January 30th, 2017 about Robyn Scott a

3      conversation, comment, slur, joke or gesture of a

4      sexual nature which unreasonably interfered with

5      an employee's work performance or unreasonably

6      created an intimidating, hostile or offensive

7      working environment?

8           A.  Yes.

9           Q.  Was the fact that Kevin Lilly was making

10     sexist comments about female employees of MiMedx

11     so loudly that other employees, including female

12     employees, could hear it, did that cause you

13     concern as a female employee of the company?

14          A.  Yes.

15          Q.  Did it cause you concern that your new --

16     that Kevin Lilly in his position -- in his new

17     position was now over the chain of command that

18     you answered to cause you concern as a female

19     employee of MiMedx?

20          A.  Yes.

21          Q.  What was your purpose of sending this

22     email, Exhibit 9?

23          A.   Just to document basically what I pulled

24     from our own employee handbook as sexual

25     harassment.  I just wanted to put it in

                                              Page 59

1    number two.

2         Q.   BY MR. SMITH:   In the email that you --

3    that is Exhibit 6, on the second page you

4    indicate, "I recorded 43 minutes of this

5    conversation."

6         Do you recall that?

7         A.   Yes.

8         Q.   And it could have been a little bit more

9    or a little bit less, but it was in the 43-minute

10   range?

11        A.   Yes.

12        Q.   And the recording of the Kevin Lilly

13   incident that you made on January 30th, 2017 was

14   around 43 minutes?

15        A.   Yes.

16        Q.   And you sent me a copy of that; correct?

17        A.   Yes.

18        Q.   After I submitted the subpoena to you;

19   correct?

20        A.   Correct.

21        Q.   And I'm going to play almost the last 9

22   minutes of it and then I'm going to ask you if you

23   can identify Kevin Lilly's voice on that

24   recording.   Okay?

25        A.   Okay.

Page 64

1              (WHEREUPON, the audio recording was

2      played.)

3              (Audio recording paused.)

4       Q.  BY MR. SMITH:  Is that Kevin Lilly's

5      voice?

6       A.  Yes.

7              (Audio recording resumed.)

8              (Audio recording paused.)

9       Q.  BY MR. SMITH:  Now, on the recording there

10     was a male voice that said, Ding dong, the witch

11     is dead.

12              Did you hear that?

13       A.  Yes.

14       Q.  And whose voice is that?

15       A.  Kevin Lilly.

16              (Audio recording resumed.)

17              (Audio recording paused.)

18       Q.  BY MR. SMITH:  Did you hear a male voice

19     say, "The most hated woman in the company"?

20       A.  Yes.  Kevin Lilly.

21       Q.  Was that voice Kevin Lilly?

22       A.  Yes.

23       Q.  Who was he referring to?

24       A.  Robyn Scott.

25              (Audio recording resumed.)

Page 65

```
 1                (Audio recording paused.)
 2          Q.  BY MR. SMITH:  Did he just -- did the male
 3     voice just refer to Pete?
 4          A.  I'm not sure who he was -- if he was
 5     talking about being in Carlton's office or Joe or
 6     Pete.  I'm not sure.
 7                (Audio recording resumed.)
 8                (Audio recording paused.)
 9          Q.  BY MR. SMITH:  Did Kevin Lilly just say,
10     "Pete looks over..."?
11          A.  Yes, correct.
12                (Audio recording resumed.)
13                (Audio recording paused.)
14          Q.  BY MR. SMITH:  I'm going to pause the
15     recording.
16                Does -- in the recording does Kevin Lilly
17     indicate -- does he state that he told Pete that
18     Robyn Scott is the one person he doesn't like in
19     the company?
20          A.  Yeah, I believe he said he hates her.
21                (Audio recording resumed.)
22                (Audio recording paused.)
23          Q.  BY MR. SMITH:  Did Kevin Lilly on this
24     recording just state, "We could fire her ass or we
25     could RIF her or whatever"?
```

Page 66

1         A.   Yes.

2              (Audio recording paused.)

3         Q.   BY MR. SMITH:   Have we just listened to

4    over -- a little over eight minutes of the

5    recording you made on January 30th, 2017 of Kevin

6    Lilly and the other employees at the national team

7    meeting?

8              MR. JONES:   At this point I just want to

9    interject because now we've heard the -- whatever

10   it was, seven or eight minutes of recording, and I

11   want to enter our stipulation and my objections.

12             MR. SMITH:   Okay.

13             MR. JONES:   And my reservations.

14             So obviously we haven't been able to

15   authenticate any of this, not that we ever will,

16   but if we chose to get an expert to see if there

17   were any breaks or changes or muffling or who all

18   the people are that are heard on here giggling or

19   making interjections, we haven't done that.  And

20   that would also possibly bear on the authenticity.

21             But for what it's worth, the witness has

22   said it's her tape, she's given it to you and it's

23   played so we don't have any objection on that

24   score.   You're just trying to interrogate her on

25   the issues.

                                        Page 67

1    we're not going to, you know, try to stop that.

2         MR. SMITH:  Right.  And you're not waiving

3    any objection you might have to whether it was

4    legally recorded or to have it examined by someone

5    forensically?

6         MR. JONES:  Agreed.

7         Q.  BY MR. SMITH:  All right.  At the end of

8    the recording that we listened to during your

9    deposition, does the voice of Kevin Lilly state,

10   when talking about Robyn Scott, that she could

11   fuck up a wet dream?

12        A.  Yes.

13        (Deposition Exhibit No. 10 was marked for

14   identification.)

15        Q.  BY MR. SMITH:  I'm going to show you

16   what's marked as Exhibit 10, which is an email --

17   appears to be an email you sent to Tim O'Brien on

18   February 6, 2017.

19        Do you recall sending that email?

20        A.  Yes.

21        Q.  Was this around the time -- was this

22   shortly after when you discussed the Kevin Lilly

23   incident with Tim O'Brien?

24        A.  Yes.

25        Q.  And you wrote, "Tim, I've had it.  We are

                                        Page 69

1      Q.   And then on March 2nd you received the

2   letter telling you that they had concluded the

3   investigation that we previously looked at?

4      A.   Correct.

5      Q.   And then shortly after that you

6   resigned?

7      A.   Yes, I resigned.  I believe it was March

8   3rd.

9      Q.   Okay.  And tell the ladies and gentlemen

10   of the jury why you resigned.

11      A.   I resigned due to MiMedx's poor handling

12   of the resolution of the incident that I reported.

13   I did not feel comfortable reporting to Kevin

14   Lilly at that time and felt that my balance with

15   work and family, that I would need to take -- or

16   to no longer be with this company.

17      Q.   Did you hear Kevin Lilly make sexist

18   comments about Robyn Scott on January 30th,

19   2017?

20      A.   Yes.

21      Q.   Did you hear Kevin Lilly say he had every

22   part in having Robyn Scott terminated from the

23   company?

24      A.   Yes.

25      Q.   Did you hear Kevin Lilly say that he

Page 75

1    discussed with Pete Petit, Joe Longo and others

2    that they could terminate Robyn Scott or they

3    could subject her to a reduction in force?

4         A.  Correct.

5         Q.  And is it your understanding that Robyn

6    was subjected to a reduction in force?

7         A.  Yes.

8         Q.  From the context of the conversation you

9    overheard on January 30th, 2017, did -- was Kevin

10   Lilly indicating that they were trying to make it

11   look like she was being subjected to a reduction

12   in force in a real attempt to get rid of her?

13        A.  Yes.

14        Q.  Switching gears a little bit.

15            Did you see tissue mistagged at MiMedx?

16        A.  Yes.

17        Q.  What is mistagging of tissue, for the

18   benefit of the ladies and gentlemen of the jury?

19        A.  Tagging of tissue within the organization

20   was for reporting of commissions, so basically

21   ownership of who sold the tissue, meaning sales

22   were -- direct sales rep with the company or

23   distributor with the company tagging those tissues

24   to procedures as well.  So making -- because it is

25   an allograft, it is a human tissue, it would need

Page 76

1    STATE OF ARIZONA            )
                                 ) ss
2    COUNTY OF MARICOPA          )

3

4

5       BE IT KNOWN that the foregoing deposition

6    was taken by me, SUSAN D. BINGHAM, CR No. 50364, a

7    Certified Reporter for the State of Arizona; that

8    prior to being examined, the witness named was

9    duly sworn to testify to the whole truth; that the

10   questions propounded and the answers of the

11   witness thereto were taken down by me and

12   thereafter reduced to computerized transcription

13   under my direction and supervision; that the

14   foregoing is a true and correct transcript of all

15   proceedings had upon the taking of said

16   deposition, all done to the best of my skill and

17   ability.

18           I further certify that I am in no way

19   related to any party to said action nor in any way

20   interested in the outcome thereof.

21           DATED at Phoenix, Arizona, this 26th day of

22   August, 2019.

23

24           SUSAN D. BINGHAM, CR No. 50364

25

Page 178

```
1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION
3        JENNIFER R. SCOTT,
4              Plaintiff,
                                    CIVIL ACTION
5          vs.                      FILE NO: 3:18-CV-01815-S
6        MIMEDX GROUP, INC.,
7              Defendant.


8
9            VIDEOTAPED DEPOSITION OF KEVIN LILLY
10
11
12                      June 19, 2019
                         9:35 a.m.
13
14
15
16
                      Littler Mendelson, PC
17                   3344 Peachtree Rd, NE
                          Suite 1500
18                     Atlanta GA 30326
19
20
21
22
23
             HEIDI L. KOSARICK, CCR-B-1139
24
25

                                             Page 1
```

```
 1              the witness.
 2                         KEVIN LILLY,
 3    Having been first duly sworn to state the truth, was
 4    examined and testified as follows:
 5                         EXAMINATION
 6    BY MR. SMITH:
 7         Q.   Could you state your name for the Court and
 8    jury, sir?
 9         A.   It's Kevin Lilly.
10         Q.   And who's your employer?
11         A.   I'm employed by MiMedx.
12         Q.   And how long have you been employed by
13    MiMedx?
14         A.   Coming up on four years.
15         Q.   And what's your current position?
16         A.   Currently, I'm the senior vice-president of
17    sales.
18         Q.   Have you ever had your deposition taken
19    before?
20         A.   Yes, I have.
21         Q.   How many times?
22         A.   One time.
23         Q.   When was that?
24         A.   I think it was last fall.  Sometime around
25    then.
```

Page 5

```
 1    interact with him after you left Matria but before

 2    you came to -- to MiMedx?

 3         A.    No.

 4         Q.    Okay.  What was your -- I believe you said

 5    your position right now is senior vice-president of

 6    sales?

 7         A.    Yes.

 8         Q.    What was your position in 2016?

 9         A.    So in I believe it was January of 2016, I

10    believe it was national vice-president sales for

11    wound care.

12         Q.    Okay.  And did -- when did that next change

13    and what was the position?

14         A.    I don't recall the date.  But sometime, I

15    believe, about a year later.  It might have been like

16    end of January of 2017.

17         Q.    Okay.  And what was your new position at

18    that time?

19         A.    I don't recall if it was -- I don't recall.

20    I think it was just vice-president of sales.

21         Q.    And then did your title change after that?

22         A.    Yeah.  I don't recall when.  At some point

23    in time it became senior vice-president of sales.

24         Q.    Okay.  Do you -- do you have an idea of how

25    long you've been -- had that title?
```

Page 13

```
 1          Q.   Well, I'm -- I'm going to ask you that.
 2          A.   Okay.
 3               MR. JONES:  What is the actual question
 4          pending, has he seen it?
 5               MR. SMITH:  No.  My -- my question was, was
 6          he ever in -- in a hotel room with Kevin -- with
 7          him, Ricky Palmer, Joe Panther, Lane Clark and
 8          Frank Braly.
 9               MR. JONES:  Gotcha.
10               THE WITNESS:  Okay.  So your question was?
11     BY MR. SMITH:
12          Q.   Well, do you recall being in a hotel room
13     with Ricky Palmer, Joe Panther, Lane Clark and Frank
14     Braly on January 30, 2017 at the Ritz Carlton during
15     a sales meeting?
16          A.   I do.
17          Q.   And you've had a chance to read Exhibit 4,
18     correct?
19          A.   Yes.
20          Q.   All right.  And Amy Powers was an employee
21     of MiMedx, correct?
22          A.   Yes.
23          Q.   Have you met Amy Powers?
24          A.   I have.
25          Q.   And Susan Schardt was an employee for
```

Page 54

1    MiMedx?

2        A.   Yes.

3        Q.   And you've met with Susan Schardt?

4        A.   Yes.

5        Q.   Was she in wound care or SSO?

6        A.   I believe Susan was in wound care.

7        Q.   And was Amy Powers in wound care or SSO?

8        A.   I believe she was in SSO.

9        Q.   Okay.  Robyn Scott, Amy Powers and Susan

10   Schardt are all females, correct?

11       A.   Correct.

12       Q.   And you're a male, correct?

13       A.   Correct.

14       Q.   Now, did you ever state 500 bucks is the

15   going rate for a hooker during that occasion?

16       A.   No.

17       Q.   Did anyone in your presence state that or

18   something like that?

19       A.   Not that I recall.

20       Q.   And then did -- do you recall anyone in your

21   group, this group of Mr. Palmer, Panther, Clark and

22   Braly and yourself, saying, We all have a girl at the

23   meeting?

24       A.   No.

25       Q.   Okay.  Did you state, If there's one person

                                        Page 55

1   who can fuck up a wet dream it's her, about Robyn

2   Scott, on that occasion?

3        A.   I don't remember.

4        Q.   Do you think you could have said it but you

5   just don't recall?

6        A.   I don't recall.

7        Q.   Okay.  Did you ever state, "Bro, thank God,

8   ding dong the wicked witch is dead"?  I had every

9   part in that.  And just so you know, I was sitting

10  around, it was Carlton and Longo were in the room

11  with Nick and I.  So I was in a meeting.  We were

12  doing all this transitioning shit and I'm sitting

13  here going for me the number one hated woman in this

14  company is her.

15       Did you say that on that occasion?

16       A.   I don't remember saying that.

17       Q.   You could have, you just don't recall?

18       A.   I don't recall.

19       Q.   Okay.  Did you ever say, So I'm sitting in

20  another meeting where I told Pete, there's one thing

21  that really bothered me about Robyn at the 2016 NSM

22  and a lunch I had with her and several others at the

23  table.  I started this conversation with her and how

24  I tried to bring everyone together.  She said, Hey,

25  wait a minute, let me tell you about me.  Kevin then

Page 56

```
 1   said, I took this to Pete.  And Pete said, Kevin, let
 2   me stop you.  Kevin said, And I was trying the best
 3   way to throw her under the bus.
 4            Did you say anything like that on that
 5   occasion?
 6        A.   I don't recall.
 7        Q.   Who is Catherine Sullivan?
 8        A.   Catherine is a -- currently?
 9        Q.   Yes.
10        A.   Catherine is a regional sales director in
11   Houston.
12        Q.   Do you supervise her?
13        A.   She's in my reporting chain of command.
14        Q.   In 2016 did you supervise Catherine
15   Sullivan?
16        A.   Catherine was under my chain of command as
17   a, I believe she was an AE on the wound care side.
18        Q.   In 2016 and 2017 Catherine Sullivan was an
19   employee of the company?
20        A.   Yes.
21        Q.   Do you recall anyone on -- well, do you
22   recall being in the hotel room with those individuals
23   on January 30, 2017?
24        A.   Yes.
25        Q.   Okay.  During that occasion in the hotel
```

Page 57

```
 1    become aware that Amy Powers had made a sex

 2    discrimination or sexual harassment complaint about

 3    you?

 4         A.   No.   The only time I became aware that Amy

 5    Powers had said anything about me was during my

 6    deposition with Mike Fox.

 7         Q.   Okay.   And -- and what did you become aware

 8    of then?

 9         A.   I think he asked me a question about, you

10    know, Was there a conversation with those people in

11    the room?

12         Q.   Okay.   And -- and what did you indicate on

13    that occasion?

14         A.   That I did not remember those comments.

15         Q.   Okay.   And then did anyone tell you

16    that -- when -- when did you become aware that Susan

17    Schardt had made a sex discrimination or sexual

18    harassment complaint about you?

19         A.   Just now when you told me.

20         Q.   Okay.  And did anyone ever indicate to you

21    that there was a recording of you?   Other than the

22    attorneys for MiMedx.

23         A.   No.

24         Q.   Okay.   No one at MiMedx indicated to you, We

25    have a recording of you?
```

Page 59

```
 1    disciplinary in the letter or not.
 2        Q.   Okay.  Well, regardless of what it said,
 3    when you received it, did Thornton Kuntz indicate to
 4    you that you were being disciplined?
 5        A.   I don't recall.
 6        Q.   And then did, prior to receiving that
 7    document, did -- were you ever told, We're -- We're
 8    looking into some allegations against you, we need to
 9    ask you some questions?
10        A.   Yes.
11        Q.   And who indicated that to you?
12        A.   It was in a meeting with Chris Cashman and
13    Thornton Kuntz.
14        Q.   Okay.  And about when did that meeting take
15    place?
16        A.   It's probably, I'm guessing, like roughly a
17    week after our national sales meeting.
18        Q.   Okay.  And who -- where did the meeting take
19    place?
20        A.   They -- we met in Chris Cashman's office.
21        Q.   How long do you recall the meeting lasting?
22        A.   I don't recall.  Do you want me to
23    speculate?
24        Q.   Well, do you think it was longer than
25    15 minutes?
```

Page 61

App. 38

1          A.    No.

2          Q.    Okay.  So you think -- you -- are you pretty

3     comfortable that that meeting was less than

4     30 minutes?

5          A.    Yes.

6          Q.    Okay.  And what do you recall Chris Cashman

7     saying in that meeting to you?

8          A.    I recall he said, There were some

9     allegations made, you know, about you, you know.  Do

10    you remember making any statements?

11         Q.    Okay.  Did he -- did he offer specific

12    statements that had been alleged that you said?

13         A.    I don't recall if he did or not.

14         Q.    Okay.  Did he ask you if you had made any

15    statements about women?

16         A.    I believe so.

17         Q.    Did he ask you if you had made any

18    statements about Robyn Scott?

19         A.    I don't know.

20         Q.    Okay.  You don't recall?

21         A.    I don't recall.

22         Q.    All right.  Did Thornton Kuntz say anything

23    at the meeting?

24         A.    Yes.

25         Q.    Okay.  First of all, back to Cashman.  What

Page 62

```
 1    referring to Frank Braly?  Did you ever refer to
 2    Frank Braly as Bra?
 3         A.   No.
 4         Q.   Okay.  Bra, thank God ding dong the wicked
 5    with is dead.  I had every part of that.  Come here.
 6    I had every part of that.  And just so you know, I
 7    was sitting around, it was Carlton and Longo were in
 8    the room with Nick and I.  So I was in a meeting.  We
 9    were doing all this transitioning shit.  And I'm
10    sitting here going for me the number one hated woman
11    in this company is her.
12              Do you see where I read that?
13         A.   Yes.
14         Q.   Did you state that on January 30, 2017?
15         A.   I don't remember stating that.
16         Q.   Could you have said it?
17              MR. JONES:  Objection to the form.
18              THE WITNESS:  I don't know.
19    BY MR. SMITH:
20         Q.   Did you ever feel that Robyn Scott was the
21    number one hated woman in MiMedx?
22         A.   I don't know.
23         Q.   Well, I'm asking you did you ever feel that
24    way?
25         A.   No.
```

Page 66

```
 1          Q.   Did you ever think that?

 2          A.   No.

 3          Q.   Okay.  Now, are you saying you didn't make

 4    this statement that's in quotes, or you just don't

 5    recall making it?

 6          A.   I don't remember.

 7          Q.   You could have, you just don't remember,

 8    correct?

 9               MR. JONES:  Objection to the form.  It's

10          been asked -- it's been asked and answered that

11          he didn't even feel or think that.

12               MR. SMITH:  Well, my -- my question is

13          different.

14               MR. JONES:  You're asking him if he didn't

15          think that but he said it anyway?

16               MR. SMITH:  Well, I'm asking him --

17    BY MR. SMITH:

18          Q.   Did you -- did you ever state, Thank God

19    ding dong the wicked witch is dead.  I had every part

20    of that.  Come here.  I had every part of that.  And

21    just so you know, I was sitting around, it was

22    Carlton and Longo were in the room with Nick and I.

23    So I was in a meeting.  We were doing all this

24    transitioning shit.  And I'm sitting here -- sitting

25    here going for me the number one hated woman in the
```

Page 67

1    company is her, closed quotes.  Did you ever say

2    that?

3         A.   I don't remember.

4         Q.   Okay.  Now, Mike Carlton is -- or what was

5    his position as of January 30, 2017?

6         A.   It doesn't say.

7         Q.   Well, do you -- do you recall what his

8    position was as of January 30, 2017?

9         A.   I think he was SVP global sales.

10        Q.   Okay.  And then was there a Nick that worked

11   for the company in January of -- January 2017,

12   December 2016?

13        A.   There were probably many Nicks.

14        Q.   Okay.  Was there a Nick Andolino?

15        A.   Yes.

16        Q.   Okay.  And then Joe Longo, he worked for the

17   company in December 2016 and January 2017, correct?

18        A.   Yes.

19        Q.   Okay.  Okay.  Now, and then further down

20   where the number 2 is, in quotes there's a statement

21   attributed to you about Robyn.  If there's one person

22   who could fuck up a wet dream it's her, closed quote.

23   Did you ever make that statement on June 30, 2017?

24             MR. JONES:  Objection; asked and answered.

25             THE WITNESS:  Not that I recall.

Page 68

1    BY MR. SMITH:

2        Q.   Well, do you specifically remember not

3    saying it?  Or do you just not remember?

4        A.   I don't remember.

5        Q.   Okay.  All right.  Were those statements

6    that we just read in Exhibit 5, that I just read to

7    you, were those the types of statements that Chris

8    Cashman asked you about in the meeting between you,

9    Chris and Thornton Kuntz?

10       A.   I don't recall.

11       Q.   Did Chris Cashman ever, in the meeting with

12   Thornton Kuntz that you previously testified, ask you

13   if you had ever said ding dong the witch is dead?

14       A.   I don't recall.

15       Q.   Did Chris Cashman ever ask you if you had

16   made a statement that you had every part of being

17   involved in Robyn Scott's separation from the

18   company?

19       A.   I don't recall.

20       Q.   Did Chris Cashman ask you if you said Robyn

21   Scott was the number one hated woman in the company?

22       A.   I don't recall.

23       Q.   Did you ever talk to Pete Petit about Robyn

24   Scott?

25       A.   I don't remember.

Page 69

1   And I think I said yes.

2       Q.   Okay.  Now, we have come -- it further goes

3   on, We advised you that we would be conducting

4   confidential investigative conversations with all of

5   the individuals that were alleged to have been in the

6   room during the overheard conversations.

7           We have completed that investigation and

8   have discussed the accusations with Ricky Palmer,

9   Lane Clark, Frank Braly, Joe Panther and Adam Domecq.

10  In our discussions with those individuals, the

11  alleged comments that you advised us were not said

12  during the conversations of January 30th could not be

13  confirmed as spoken by you or someone else.  In those

14  discussions, the certain comments that you

15  acknowledge saying were confirmed as being said by

16  you.

17          Okay.  Did anyone else in the hotel room on

18  January 30, 2017, when you were hosting these fellow

19  male employees, did anyone else make any comment

20  about Robyn Scott that you remember?

21      A.   I don't remember.

22      Q.   Okay.  Did anyone else make a comment about

23  Robyn being the -- the most hated person in the

24  company?

25      A.   I don't remember.

Page 74

```
 1          Q.    Did anyone else state that Robyn Scott could
 2     fuck up a wet dream, or words to that effect?
 3          A.    I don't remember.
 4          Q.    Would you agree that an employee of MiMedx
 5     who makes comments like that would violate MiMedx's
 6     sexual harassment and sex discrimination policy?
 7          A.    I don't know.
 8          Q.    Okay.  Do you think a male employee that
 9     says that a female employee could fuck up a wet
10     dream, do you think a male employee of MiMedx that
11     makes that statement, violates the company's policy
12     against sex discrimination and/or sexual harassment?
13          A.    I don't know.
14          Q.    Okay.  Do you think if a male employee of
15     MiMedx says that a female employee gets business
16     because of her chest, that that would violate
17     MiMedx's policy against sex discrimination and/or
18     sexual harassment?
19          A.    I don't know.
20          Q.    Now, going down two paragraphs to the
21     paragraph that starts, Please be advised, do you see
22     that?
23          A.    I do.
24          Q.    Please be advised that although the comments
25     we confirmed you made regarding Robyn Scott were not
```

Page 75

```
 1                  C E R T I F I C A T E

 2

 3          I, HEIDI KOSARICK, CCR No. B-1139, Certified

 4      Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken

 6      before me at the time and place therein set

 7      forth, at which time the witness was put under

 8      oath by me;

 9          That the testimony of the witness, the

10      questions propounded, and the objections and

11      statements made at the time of the examination

12      were recorded stenographically by me and were

13      thereafter transcribed;.

14          That the foregoing is a true and correct

15      transcript of my shorthand notes taken.

16          I further certify that I am not a relative

17      or employee of any attorney or the parties, nor

18      financially interested in the action.

19          I declare under penalty of perjury under the

20      laws of Georgia that the foregoing is true and

21      correct.

22          Dated this 2nd day of July, 2019.

23

24

                    HEIDI L. KOSARICK, CCR-B-1139

25
```

Page 110

Job No. 3398998

1 | ERRATA for ASSIGNMENT 3398998

2 | I, the undersigned, do hereby certify that I have
read the transcript of my testimony, and that

3 |

4 | _____ There are no changes noted.

5 | ___X___ The following changes are noted:

6 |

Pursuant to Rule 30(7)(e) of the Federal Rules of

7 | Civil Procedure and/or O.C.G.A. 9-11-30(e), any
changes in form or substance which you desire to make

8 | to your deposition testimony shall be entered upon
the deposition with a statement of the reasons given

9 | for making them.  To assist you in making any such
corrections, please use the form below.  If

10 | additional pages are necessary, please furnish same
and attach.

11 |

12 | Page  10    Line  25    Change  Spectris should be SpectRx

13 | _____

14 | Reason for change  correction

15 | Page  94    Line  25    Change  AK should be 8k

16 | _____

17 | Reason for change  correction

18 | Page_____ Line_____ Change _____

19 | _____

20 | Reason for change _____

21 | Page_____ Line_____ Change _____

22 | _____

23 | Reason for change _____

24 | Page_____ Line_____ Change _____

25 | _____

Page 111

RECEIVED

JUL 3 1 2019

Veritext Legal Solutions

App. 47

Job No. 3398998

```
1    Reason for change _____
2    Page_____ Line_____ Change _____
3    _____
4    Reason for change _____
5    Page_____ Line_____ Change _____
6    _____
7    Reason for change _____
8    Page_____ Line_____ Change _____
9    _____
10   Reason for change _____
11   Page_____ Line_____ Change _____
12   _____
13   Reason for change _____
14   Page_____ Line_____ Change _____
15   _____
16   Reason for change _____
17
18
19
                    KEVIN LILLY
20
21   Sworn to and subscribed before me this
     __31__ day of ___July_____, 2019.
22
23   _____
     NOTARY PUBLIC
24   My commission expires: __01│30│2021__
25
```

RECEIVED

JUL 3 1 2019

Veritext Legal Solutions

App. 48

January 30, 2017



## THE RITZ·CARLTON

ORLANDO, GRANDE LAKES

Dear Guest,

We hope you are enjoying your visit with us!

Please accept our sincerest apologies for the inconvenience you may have experienced early this morning when one of our main pool pumps malfunctioned promptly activating our alert system. At this time, we have addressed this issue and do not anticipate any further disturbances.

Thank you for your patience and understanding. Should you have any questions or need further assistance, please contact any of our Ladies and Gentlemen at our Front Reception by dialing "0" from your guestroom and they will be delighted to assist.

Warmest regards,

Jenny Piccione
Hotel Manager

*One person who could*
*fuck up a wet dream*

*— RSD - Robyn Scott*

# AMY POWERS AUDIO RECORDING OF KEVIN LILLY AND OTHERS ON JANUARY 30, 2017 AT THE RITZ CARLTON HOTEL

## SUBMITTED BY MANUAL FILING

